1  JODI LINKER
Federal Public Defender
2  Northern District of California
JOHN PAUL REICHMUTH (CASBN 194844)
3  Assistant Federal Public Defender
1301 Clay Street, Ste. 1350N
4  Oakland, CA 94612
Telephone:     (510) 637-3500
5  Facsimile:      (510) 637-3507
Email: john_reichmuth@fd.org

6

7  Counsel for Defendant PERRY

8

9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                              OAKLAND DIVISION

12

13  UNITED STATES OF AMERICA,                    **Case No.:** 21–CR–485 HSG

14                    Plaintiff,                 **SENTENCING MEMORANDUM ON
                                                 BEHALF OF NISAIAH PERRY**
15          v.
                                                 **Court:**          Courtroom 2, 4th Floor
16  NISAIAH PERRY,                               **Hearing Date:**   May 1, 2024
                                                 **Hearing Time:**   2:00 p.m.
17                    Defendant.

18

19

20          Mr. Perry has been in custody for 28 months.  He is in the best position in his life to reenter

21  society:  After spending much of his life in prison, he has an almost two-year old child, a loving

22  family, an intensive rehabilitative regimen, and a safe home.  The support that he has received from

23  his family and friends and the genuine efforts he has made to change his thinking show that he is very

24  capable of being a valued member of this community in the immediate future.

25          The Probation Officer requests a sentence of 37 months prison.  The defense has no objections

26  to the calculations or findings in the Final Presentence Report (19/III, 37-46 months).  The defense

27  requests that Mr. Perry be sentenced effectively to 37 total months of imprisonment, by imposing a

28  sentence of 8 months prison to commence on the date of sentencing.  He has been in custody since

SENTENCING MEMORANDUM
*PERRY*, 21–CR–485 HSG

1

December 1, 2021. PSR, p.1.  The requested sentence would result in custody until January 1, 2025, more than three years after he entered custody.

## I.    BACKGROUND

### A.    Mr. Perry's History and Characteristics

It should come as no surprise that a person who lived in CYA in the 1990's endured a deprived and inhumane childhood before CYA and a life of recidivism after it.  Mr. Perry was born in 1978, so he was still a child when crack cocaine took his mother away from him in spirit if not body:  "He indicated her crack addiction was primary, and the defendant was the second priority."   His father taught him how to cook and to sell drugs.  Both of his parents physically abused him and each other.  PSR ¶¶ 43-45. The difficulties he endured as a child are notable.

Mr. Perry is thus here before this Court because of extreme childhood deprivation, but the criminal justice system also likely contributed to his antisocial survival skills rather than reducing them.  At CYA he lived through what are known as "gladiator fights."  PSR ¶ 46. Mr. Perry's CYA commitment occurred in the 1990's, years before California began to reform its juvenile justice system.  PSR ¶ 26. Mr. Perry was exposed to this completely broken system for years.  In 2006, the California Department of Corrections and Rehabilitation, Division of Juvenile Justice, issued its "Safety and Welfare Plan: Implementing Reform in California," ("CDC Safety Plan")[1], which concluded:

> California is failing its children. Youth arrive at institutions with serious preexisting conditions. Many have been abused and neglected, some are mentally ill.
> All have been failures – most in multiple domains. Not many youth have the chance of leaving California's juvenile correctional facilities with their lives turned around. Given what we have seen, no doubt some leave worse off than when they arrived.

*Id.* at 6 (attached as Exhibit A). The report identified the problems plaguing California's juvenile justice system as including: "[h]igh levels of violence and fear in its institutions," "unsafe conditions for both residents and staff," "[a]n adult corrections mentality with an adult/juvenile mix,"

---

[1] Attached as Ex. A.

"[f]requent lockdowns to manage violence with subsequent program reductions," "[l]engths of stay almost triple the average for the nation," "[c]apitulation to gang culture with youths housed by gang affiliation," and "[p]oor re-entry planning and too few services on parole." *Id.* at 1.  Though he "chose" to re-offend upon being paroled from CYA, recidivism was one of the worst pathologies of that system.  Mr. Perry is a survivor of several major traumas, including lengthy incarceration in a dangerous and dysfunctional prison system for children.  His ACES score is 7 out of 10.  PSR ¶ 56.

Despite the massive challenges he has faced, Mr. Perry is surrounded by people who care about him and acknowledge how much he improves their lives.  Rose Perry, his wife, writes: "He is not just a loving partner but also a devoted father, son in-law and member of our community. His absence has had a profound impact on our family, especially on our daughter Nisaiah Jovanna 'Renee. We rely on him not only for financial support but also for his guidance, love, and stability."  Letters, attached as Ex. B.

Mr. Perry's nephew Alan-Michael Barnes similarly shares a very powerful letter describing the role that Mr. Perry played in Mr. Barnes' success as a Senior Systems Engineer despite growing up in Oakland.

> Those close to [Mr. Perry] benefit immensely from his presence. In a system that often judges superficially, good people are routinely separated from their loved ones. It is crucial to recognize the depth of his character and the profound impact he has had on me and my siblings. His guidance kept me on a straight path. Without it, I might have succumbed to the negative influences prevalent in our neighborhood." *Id.*

Mr. Perry's mother-in-law Inez Henderson observes: "I firmly believe that Nisaiah Perry has taken meaningful steps towards positive change and rehabilitation during his time in custody. He has shown a sincere desire to make amends and contribute positively to his community." *Id.*

Mr. Perry's letter to the Court also shows an uncommon degree of change and insight.  He writes:

> My wife and child are far from the only victims in this case.  The community of Oakland suffers when people act in reckless and dangerous ways with firearms.  I apologize for partaking in any such activities at any point in my life.  I also would like to apologize to the community, the courts, and to the Oakland Police Department for any such acts that have been detrimental to persons or property.  My thinking has changed and I now think of the needs of others which has matured me into a much better prosocial human being. *Id.*

SENTENCING MEMORANDUM
*PERRY*, 21–CR–485 HSG

1

2       There are several more letters, included but not set forth here, that the Court will find helpful.

3    They show that Mr. Perry, a very damaged person working toward reentry following years in prison,

4    energetically engages his community in beneficial ways.

5       Of paramount importance to the issue of character, Mr. Perry did not have his new daughter in

6    his life when he committed this offense.  She is a powerful motivator for him.  He has thrown himself

7    into parenting classes, earning "exceptional" marks and reaching eleven months of biweekly classes,

8    that is, *approximately 80 sessions*.  Ex. C.  And these were not his only rehabilitative efforts in jail.

9       Allowing him to release soon and immerse himself in parenting would continue and heighten

10   this level of structure.  Because Mr. Perry's wife works full-time, his elderly mother-in-law, Ms.

11   Henderson, cares for his 21-month-old child during the day before she goes to work in the evenings.

12   She is 70 years of age with several medical conditions.  PSR¶ 52.  Mr. Perry thus has a safe home and

13   close to full-time parenting waiting for him upon release.  This is an opportunity not only to help his

14   family with these extraordinary responsibilities, but also to utilize parenting as a driver of change and

15   successful reentry after decades of institutionalization.

16                **B.        The Nature and Circumstance of the Offense**

17       The conduct in this case is unacceptable, but counsel is aware of no evidence that Mr. Perry

18   was a shooter in the incident, namely gunshot residue on Mr. Perry's hands.[2]  He stated to the

19   Probation Officer that there was someone else in the car: "There was a lot going on. Someone else

20   was in my car, and I drove off.  There was a whole lot of shootings going on."  PSR ¶ 12.

21   Additionally, witnesses from that evening submitted statements to defense counsel in Superior Court,

22   one of which is attached as Ex. D. Mr. Rainbolt wrote that Mr. Perry was there to shoot a music

23   video:

24       I am in charge of equipment and the well-being of artist when out at events there was at no time
         any guns in the truck or on the persons of Mr.  Perry we were there to work at the time of the
25       shooting everyone was leaving the event Mr. Perry was making his way to the exit when the
         shots first started as I was trying to collect the equipment the place went into chaos I began to
26       look for the other artist so we could get to safety once I located who I was looking for we began
         to look for Mr. Perry making our way in the direction Mr. Perry was going towards his truck

27

28   _____
     [2] The Police Report indicates that "Officer Ruiz obtained a DNA buccal swab sample and administered
     a gunshot residue test kit (GSR) on Perry."

SENTENCING MEMORANDUM
*PERRY*, 21–CR–485 HSG

4

once we reached the truck Mr. Perry took off as we were reaching for the door leaving us behind. *Id.*

The evidence also shows that Mr. Perry was targeted by a shooter. His vehicle was hit by gunfire. PSR ¶ 6. Thus, the evidence is consistent with him not shooting but being shot at, though he clearly possessed the firearms in this case and accepts responsibility for that.

## II.   ARGUMENT

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). "[T]he sentencing judge [must] consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors listed at 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended by the U.S. Sentencing Guidelines is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

A sentence that results in release in eight months would best effectuate the sentencing statute. This would combine an excellent release plan, major rehabilitative efforts by Mr. Perry, and a significant prison consequence to best protect the community and help Mr. Perry succeed as a working parent and member of the community.

Extraordinary family responsibilities justify such a sentence. Mr. Perry has a 21-month-old child being raised largely by his mother-in-law. An additional 37-month sentence will effectively deprive this child of her father for close to five years. The need to protect the public supports allowing Mr. Perry to be a parent before the child is too old. A recent study in the Journal of the American Medical Association ("JAMA") demonstrated "that parental incarceration is associated with a broad range of psychiatric, legal, financial, and social outcomes during young adulthood" and "may perpetuate disadvantage from generation to generation." Gifford, et al., "Association of

SENTENCING MEMORANDUM
*PERRY*, 21–CR–485 HSG

1

2
Parental Incarceration With Psychiatric and Functional Outcomes of Young Adults," *JAMA Network Open*, (Aug. 23, 2019).[3]  The study explained

3
> The incarceration of a parent represents a serious disruption of a child's life.  Our results

4
> revealed that the incarceration of a parent figure was common, disproportionally so in African
> American and American Indian families, a risk factor for anxiety and substance use disorders a

5
> decade or more later and associated with significant hurdles during the transition to adulthood,
> including having a felony charge, spending time incarcerated, not completing high school,

6
> becoming a parent when younger than 18 years, and being socially isolated.  These associations
> remained when accounting for a broad range of other childhood psychiatric status and

7
> adversities such as poverty and maltreatment, suggesting that childhood parental incarceration
> has an enduring reach into offspring's adult lives.  *Id.*

8

9
Courts have long recognized that a defendant's family pays a high price when a court imposes a

10
prison sentence.  One district court has observed that "[c]ausing the needless suffering of young,

11
innocent children does not promote the ends of justice."  *United States v. Chambers*, 885 F. Supp. 12,

12
15 (D.D.C. 1995).  Mindful of the collateral consequences of separating a parent from his children,

13
district courts have imposed—and Circuit courts have affirmed—sentences outside the advisory

14
Guideline range based on family circumstances.  *See, e.g., United States v. Whitehead*, 532 F.3d 991,

15
993 (9th Cir. 2008) (affirming probation sentence when advisory Guidelines range was 41-51 months

16
because, in part, of dependence between the defendant and his 8 year old daughter); *United States v.*

17
*Husein*, 478 F.3d 318, 324, 327-28 (6th Cir. 2007) (affirming non-custodial sentence of 270 days of

18
house arrest when advisory Guideline range was 37-46 months in part due to family circumstances);

19
*United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (affirming sentence of two years house

20
arrest and community service when advisory Guideline range was 46-57 months because "sentencing

21
court thought that if defendant were imprisoned the family unit would probably be destroyed, and

22
defendant's wife and children relegated to public assistance").

23
Mr. Perry's childhood deprivation, partially at the hands of a dysfunctional children's prison

24
system, further justifies the requested sentence.  Such experiences are mitigating because they were

25
not his fault and they left him with significant challenges.  Mr. Perry needs intensive rehabilitative

26

27

28

---

[3] *Available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2748665.

SENTENCING MEMORANDUM
*PERRY*, 21–CR–485 HSG

support to reenter society because of the experiences he has faced, including at the hands of the State. In way, the State owes him that.

But mostly, the requested sentence is called for by the opportunity that lies in the combined circumstances in this case. Mr. Perry has good character, a documented and high motivation to change, a home, a child, and a loving and supportive group of family and friends, all after experiencing extreme childhood deprivation and lengthy, and pathological, institutionalization. Given his challenges, evidence-based interventions should capitalize on this moment in his life. This Court, or an established collaborative court, could closely monitor Mr. Perry's progress upon release and impose successful interventions under Supervised Release, such as Courage to Change, Dolan group, and individual trauma-focused therapy, to ensure that the goals of sentencing are met. Additional years in prison promise far less to society and Mr. Perry at a much greater cost.

## III. CONCLUSION

For the reasons described above, Mr. Perry respectfully requests that the Court impose a sentence of eight months imprisonment, consecutive to all of the time (29 months) to commence on the date of sentencing, to create an actual continuous custodial sentence of 37 months and a release date of January 1, 2025. Such a sentence is sufficient but not greater than necessary to achieve the 18 U.S.C. § 3553(a) sentencing goals.


Dated:     April 24, 2024                                  Respectfully submitted,

                                                           JODI LINKER
                                                           Federal Public Defender
                                                           Northern District of California

                                                                      /S
                                                           JOHN PAUL REICHMUTH
                                                           Assistant Federal Public Defender


SENTENCING MEMORANDUM
*PERRY*, 21–CR–485 HSG